## Court of Oyer and Terminer—New York County.

*October*, 1885.

## PEOPLE *v.* WARD.

EVIDENCE.—TELEPHONIC CONVERSATION.—LARCENY OF CERTIFI-
CATION OF CHECK.—PLEADING.—INDICTMENT.—DEMURRER
FOR MISJOINDER.—MOTION TO COMPEL ELECTION.—
MOTION TO DISCHARGE JURY ON GROUND OF
IMPROPER COMMUNICATION IN
OPENING.

It is competent for a witness to testify to a conversation over a telephone, and to statements made by the other party thereto, where the witness called said party to the instrument and recognized his voice in response.

The certification of a check is a thing in action within the meaning of section 528, Penal Code, defining larceny. It acknowledges that the money is there, and is an agreement on the part of the bank, to pay the check. If the obligation assumed by such certification be obtained from the bank under circumstances amounting to false pretense, the crime of larceny is committed under said section.

Though the check in question has been passed by the defendant, the drawer, in the course of business, to a third party, by whom it is presented at the bank for certification, if the defendant, on being notified thereof, makes the false representations by which the certification is obtained, he is guilty of said crime ; and he may be convicted thereof under an indictment containing allegations that defendant "presented his check for certification" and "obtained the certification."

Where the indictment charges that defendant "by color and aid of said false and fraudulent pretenses and representations," feloniously

obtained such certification, it is unnecessary that it allege in terms that the bank was deceived by the representations ; though it must be proven by the prosecution that the bank relied thereon.

The indictment in the case at bar contained four counts: the first charging that on May 5, 1884, defendant obtained from the Marine Bank $71,800 in money, by color and aid of false representations concerning a check for $75,000, on the First National Bank, which defendant had deposited with said Marine Bank; the second charging that on the same day defendant obtained from the Marine Bank an evidence of a right in action, to wit, the certification of a check for $71,800, drawn by him on said bank, by color and aid of false representations concerning a check for $75,000 on the First National Bank, which defendant had deposited with said Marine Bank; the third charging that the defendant on the same day obtained from the Marine Bank $71,800, in money, by color and aid of a check for $75,000 on the First National Bank, which he had deposited with the Marine Bank, defendant knowing that he was not entitled to draw on the payee for the sum named therein; the fourth charging that on the same day, defendant obtained from the Marine Bank an evidence of a right in action, to wit, the certification of a check for $71,800, drawn by him on said bank, by color and aid of a check for $75,000 on the First National Bank, which he had deposited with the Marine Bank, defendant knowing that he was not entitled to draw on the payee for the sum named therein ; and the fifth charging that on the same day with intent to cheat and defraud, the defendant designedly obtained the signature of the paying teller of the Marine Bank to a written instrument, viz., the certification of a check for $71,800, drawn by him on said bank, by color and aid of false pretenses concerning a check for $75,000, etc. The first two counts were framed under section 528, Penal Code, the third and fourth under section 529, and the fifth under section 566.

*Held,* that a demurrer to such indictment on the ground that it charged more than one crime within the meaning of sections 278 and 279, Code Crim. Pro., would not lie.

*Further held,* that the court could properly defer the decision of a motion to compel the prosecution to elect which of said counts the defendant should be tried on, until the evidence of both sides was in; and in this case the court compelled the prosecution to elect between the first four counts, and the fifth count of the indictment; and upon the prosecution electing to stand upon the second and fourth counts, the court limited them to the second count.

In the case at bar, the district attorney, when opening the case to the jury, used the following language: "Remember this prisoner is not to be tried because it has been said of him that he has wrecked the Marine Bank, thereby leaving many of its depositors in an impoverished condition. Remember also that this prisoner is not upon trial because it

has been alleged of him that he robbed General Grant's family of all the money he had, and sent him broken-hearted to his grave. Remember that he is not upon trial because, through fraud and deceit, he caused to be sent to prison for the term of ten years an old man who had for years been his friend."

*Held,* insufficient to sustain an application for the discharge of the jury, the court charging them to disregard such statements.

TRIAL of an indictment for larceny in the first degree, in the Court of Oyer and Terminer of New York county, Hon. GEORGE C. BARRETT presiding.

The indictment was found against the defendant, Ferdinand Ward, in the Court of General Sessions of New York, October 19, 1885, and was thereafter ordered to the Oyer and Terminer for trial. On being arraigned, the defendant pleaded "not guilty," reserving his right to withdraw said plea and interpose a demurrer, which, on October 22, he did, demurring to each count severally, on the ground that the facts stated therein did not constitute a crime, and that it did not contain a plain and concise statement of the act constituting a crime in accordance with sections 275, 276, Code Crim. Proc.; and to the whole indictment, on the ground that it charged more than one crime within the meaning of sections 278, 279, Code Crim. Proc.

The demurrer was disallowed.

After four days occupied in impaneling a jury, the trial was begun on October 26, 1885, and continued to and including October 28, 1885.

The indictment contained five counts:

*First count.* Charging that on May 5, 1884, the defendant feloniously obtained from the Marine National Bank of New York city, $71,800, in money, by color and aid of fraudulent and false representations and pretenses regarding a check on the First National Bank of said city, for $75,000, deposited by defendant with said Marine Bank, which said check was set forth therein, and was the same in words and figures as the check on the First National Bank set out below in the second count, and the representations therein set forth were also of the same tenor as those alleged in the second count below.

*Second count.* And the grand jury aforesaid, by this indictment further accuse the said Ferdinand Ward of the crime of grand larceny in the first degree, committed as follows:

"Heretofore, to wit: On the first day of May, in the year of our Lord one thousand eight hundred and eighty-four, at the city and county aforesaid, there was deposited and placed with the Marine National Bank of the city of New York, a corporation then and there duly existing under and by virtue of the laws of the United States of America, to the credit of the said Ferdinand Ward, a certain paper writing in the words and figures following, that is to say:

'No.　　　　　　　　　　　　New York, May 5, 1884.
　　　　　　First National Bank
　　　　　　　'Pay to the order of self
　　　　　　　'Seventy-five thousand dollars.
'$75,000.　　　　　　　　　　　　Ferdinand Ward.'

"And afterwards, to wit: on the day and in the year aforesaid, the said Ferdinand Ward, late of the said city and county, at the city and county aforesaid, did present to the said corporation for certification a certain other paper writing, being an order for the payment of money dated New York May 5, 1884, drawn by him the said Ferdinand Ward, upon the said corporation and directing the said corporation to pay to the order of W. S. Warner seventy-one thousand eight hundred dollars, and with intent to deprive and defraud the said corporation of the personal property herein after described, and of the use and benefit thereof, and to appropriate the same to his own use, did then and there feloniously, knowingly and fraudulently, falsely pretend and represent to the said corporation: That the said paper writing so as aforesaid then and there deposited and placed with the said corporation to the credit of the said Ferdinand Ward, was then and there a good and valid order for the payment of money and of the value of seventy-five thousand dollars. That the said Ferdinand Ward then had a credit with a certain banking institution then known as the First National Bank of the city of New York (being the bank named in the paper writing last aforesaid), to the amount of the value of seventy-five thousand dollars, against which he, the

said Ferdinand Ward, was then justly entitled to draw. And that by reason of the depositing and placing of the said paper writing in manner aforesaid to his credit with the said corporation, and by reason of the credit thereby created, he the said Ferdinand Ward was then and there justly entitled to draw or order the payment of the sum of seventy-one thousand eight hundred dollars out of the money and funds of the said corporation.

" By color and by aid of which said false and fraudulent pretenses and representations, he, the said Ferdinand Ward did then and there feloniously obtain from the possession of the said corporation a certain instrument and writing commonly called a certification, by the said corporation then and there placed and caused to be placed upon the face of the paper writing and order for the payment of money so presented to the said corporation by the said Ferdinand Ward for certification as aforesaid, the same being an instrument and writing duly signed by one Benjamin Fish who was then and there the paying teller of the said corporation, and then and there having full power and authority in the premises, wherein and whereby the said Benjamin Fish, as such paying teller as aforesaid, did then and there certify and declare on the behalf of the said corporation that the said Ferdinand Ward was then justly entitled to draw and order the payment of the said sum of seventy-one thousand and eight hundred dollars out of the money and funds of the said corporation, and that the said last mentioned paper writing and order for the payment of money was then and there a good and valid order for the payment of the said sum of seventy-one thousand and eight hundred dollars, and that the said corporation would hold and retain the said sum of seventy-one thousand and eight hundred dollars, wherewith and whereby to pay the said order upon its presentation, which certification is as follows, that to say :

' Certified.
' May 5, 1884,
' F I S H, Teller.
' Marine National Bank,'

And being then and there an instrument and writing and evidence of a right in action of great value, to wit : of the value of seventy-one thousand eight hundred dollars, of the personal property of the said corporation, he, the said Ferdinand Ward then and there intending to deprive and defraud the said corporation of the same and of the use and benefit thereof, and to appropriate the same to his own use.

" Whereas, in truth and in fact, the said paper writing so as aforesaid then and there deposited and placed with the said corporation to the credit of the said Ferdinand Ward, was not then and there a good and valid order for the payment of money, and was not then and there of the value of seventy-five thousand dollars, or of any value whatsoever, but was in truth and in fact then and there utterly void and worthless, as he, the said Ferdinand Ward, then and there well knew.

" And whereas, in truth and in fact, he, the said Ferdinand Ward, did not then have a credit with the said First National Bank to the amount of the value of seventy-five thousand dollars, against which, he, the said Ferdinand Ward was then justly entitled to draw, as he, the said Ferdinand Ward then and there well knew.

" And whereas, in truth and in fact, he, the said Ferdinand Ward, was not by reason of the depositing and placing of the said paper writing in manner aforesaid to his credit with the said corporation, and by reason of the credit thereby created, then and there justly entitled to draw and order the payment of the said sum of seventy-one thousand eight hundred dollars out of the moneys and funds of the said corporation, as he, the said Ferdinand Ward then and there well knew.

" And whereas, in truth and in fact, the pretense and representations so made as aforesaid by the said Ferdinand Ward to the said corporation, was and were then and there in all respects utterly false and untrue, as he, the said Ferdinand Ward, at the time of making the same then and there well knew.

" And so the grand jury aforesaid, do say, that the said Ferdinand Ward, the said instrument and writing and evidence of a right in action, of the personal property of the said corporation, in manner and form and by the means aforesaid,

did feloniously steal, against the form of the statute in such case made and provided, and against the peace of the people of the state of New York and their dignity."

*Third count.* Charging, that on May 5, 1884, the defendant feloniously and willfully and with intent to defraud, obtained from the Marine Bank, $71,800, in money, by color and aid of a check for $75,000, on the First National Bank, deposited by defendant with the Marine Bank (the purport whereof was pleaded therein, and was the same as that of the check on the First National Bank set out above in the second count), knowing that he was not entitled to draw on the payee for the sum named therein, or to order the payment thereof by said First National Bank.

*Fourth count.* Charging, that on May 5, 1884, defendant feloniously and willfully and with intent to defraud, obtained from the Marine Bank an instrument and writing and evidence of a right in action, viz: the certification of a check for $71,800, drawn by him on said bank (the purport of which said check was pleaded therein and was the same as that of the check on the Marine Bank referred to in the second count above, and the words and figures of which said certification, which was set forth in full therein, were the same as those of the certification set out above in the second count), by color and aid of a check for $75,000, on the First National Bank, deposited by defendant with said Marine Bank (the purport whereof was pleaded therein and was the same as that of the check on the First National Bank, set out above in the second count), knowing that he was not entitled to draw on the payee for the sum named therein, or to order the payment thereof by said First National Bank.

*Fifth count.* Charging, that on May 5, 1834, with intent to cheat and defraud, etc., the defendant designedly obtained the signature of Benjamin Fish, the paying teller of the Marine Bank, to a written instrument, viz: the certification of a check for $71,800, drawn by him on said bank (the purport of which said check was pleaded, and was the same as that of the check on the Marine Bank referred to above in the second count, and the words and figures of which said certification, which was set forth in full therein, were the same as those of

the certification set out above in the second count), by color and aid of false pretenses set forth therein and of the same tenor as those set out in the first and second counts.

The different counts were founded on the same transaction, but excepting the identity of names, dates, amounts, representations, etc., there was nothing on the face of the indictment to show that fact. The first four counts in terms charged the crime of larceny.

The first and second counts were framed under section 528 of the Penal Code; the third and fourth under section 529; and the fifth under section 566.

*Randolph B. Martine*, district attorney, and *John R. Fellows, De Lancey Nicoll* and *Ambrose H. Purdy* (assistants), for the people

*Benjamin F. Tracy, W. Bourke Cockran* and *James R. Cuming*, for the defendant.

*Mr. Martine* opened the case in behalf of the people. After reading to the jury sections 528 and 529 of the Penal Code, he proceeded:

" Stripped of its legal verbiage, this indictment charges the prisoner, Ferdinand Ward, with having, on May 5, 1884, in the city of New York, presented to the Marine Bank of the city of New York, a check for the sum of $71,800, and that by the aid and color of another check for the sum of $75,000, he obtained the certification of this check for $71,800; the check for $75,000 not being certified, and being drawn upon the First National Bank of the city of New York, in each of which banks I shall show you the defendant kept an account. It charges that the money was paid upon this check of $71,800, drawn on the Marine Bank; that the check for $75,000 which was deposited, was not good; that the money was not in the First National Bank to meet it; and that thereby the defendant stole this sum of $71,800.

" The transaction, as described in the indictment, is simply that the defendant deposited this check of $75,000, and on the faith of it, he got $71,800, while he knew at the time, and the fact was, that the $75,000 which, by giving this check, he rep-

resented was in the First National Bank, was not there. We shall show, gentlemen, by witnesses, that on May 5, this deposit for $75,000 was made in the Marine Bank where this defendant kept an account. We shall show to you afterwards, that this check for $71,800 was presented for certification; that, upon its being presented to the paying teller of the Marine Bank, he took the check to the president of the bank, and explained to him about the deposit of this check uncertified, and asked of the president whether or not he should certify the check for $71,800; that the president thereupon went to the telephone, rang the bell, and said: 'Ward, here is your check for $71,800, presented against your uncertified check for $75,000; what about that?'; that the answer came back over the wire to the president: 'All right; the check on the First National Bank is good, and the money is there to pay it.' It will appear from the evidence, gentlemen, that the reason the officers of the bank took so much pains about this especial check, is to be found in the following facts: On the business day before (May 3), there had been deposited in their bank, a check by this defendant for the sum of $80,000, against which he had caused to be certified a check for $81,000, drawn to the order of William S. Warner. Very early Monday morning, and before banking hours, this defendant came into the Marine Bank and saw the paying teller, and said to him: 'I hope you will not send forward my check of $80,000; I have taken out the check of $81,000 which you certified for me.' The receiving teller said, 'I cannot hold back that check unless I get express orders from the president of the bank.' Thereupon the defendant went to the president of the bank and told to him the same story about the taking out of the check, and that it would not come through the exchanges, and that he had not used it, and asked that the check be held back. Upon that representation, the president of the bank gave directions to the receiving teller to hold back the $80,000 check on the First National Bank, because Mr. Ward said he had not used it. What, then, was the surprise of these officers to find that within a few minutes afterwards, this check for $81,000 did come through the exchanges, and was in those exchanges paid by the Marine Bank. Immediately upon that, the president went

to the telephone,—this being in the morning and prior to the telephonic conversation referred to above—and called up Mr. Ward, and directed his attention to that, and said, ' Here is your check for $81,000 ; you told me you had taken that out.' The answer came back : ' It is all right. I will attend to it !' We shall show you, gentlemen, that the money was not in the First National Bank to pay the checks, and that by the transaction on which this indictment is based, this defendant stole from the Marine Bank the sum of $71,800, as he had also stolen the sum of $81,000 before. We shall show you these facts, we think, beyond all question of doubt, and when we shall have shown them, we shall claim at your hands a verdict against this defendant of grand larceny in the first degree, as charged in the indictment.

"The care, gentlemen, which has been exercised in your selection, and the questions that have been put to you upon your examination as to your competency as jurors, must have shown you that we deem this case one of no ordinary importance. I think it will be proper, at this time, that I should make a suggestion to you as to the position of the prosecuting officer. It is but right that I should say that in this position, I stand here in the interest of no private individual or corporation. This prosecution is conducted solely in my official capacity as district attorney of this county. I am acting strictly in the line of my official duty ; and what that official duty is, has been stated in a manner much better than I can express it, in a book written as early as the year 1816, called ' State Trials,' from which I shall read to you a short extract. Of the prosecuting officer, it says : ' He will be found pressing nothing illegal against the prisoner, nothing hard and unreasonable (however in strictness legal) ; using no artifice to deprive him of his just defense, treating his witnesses with decency and candor ; being not so intent upon convicting the prisoner, as upon discovering truth, and bringing real offenders to justice ; looking upon himself, according to that famous saying of Queen Elizabeth, not so much retained *pro Domina Regina*, as *pro Domina Veritate*, which I shall take the liberty of translating as not so much for our mistress the Queen, as for our mistress, Truth. And so in this case I have, up to the present time, and

shall, I trust, to the end, conduct it for the purpose of eliciting the truth and of performing my official duty ; and in the discharge of that official duty, recognizing, as I do, that I am counsel in this case, not alone for the people, but in some sense also for this defendant—I say to you that you must not permit anything outside of this case to weigh the least with you in your duty. You must remember that the prisoner is here upon trial for the crime of grand larceny in the first degree, as described in this indictment, and if you have heard anything of him affecting your judgment, outside of this case, it is right that I say to you, that you should dismiss it from your consideration. Remember that this prisoner is not to be tried because it has been said of him that he has wrecked the Marine Bank, thereby leaving many of its depositors in an impoverished condition. Remember also, that this prisoner is not upon trial because it is alleged of him that he robbed General Grant's family of all the money that he had, and sent him brokenhearted to his grave. Remember that he is not upon trial because it has been said of him, that through fraud and deceit, he caused to be sent to prison for the term of ten years, an old man who had for years been his friend."

*Mr. Tracy.* "I submit that the counsel for the people is traveling outside of the issue of this indictment in his opening to the jury, and making communications to them that are not involved in this issue."

*Mr. Martine.* " It seems to me to be a legitimate opening, and that this is done for the purpose of interrupting."

THE COURT. I can see no necessity for it. The district attorney's observations seem to be a warning to the jury."

*Mr. Tracy.* "It is bringing an allegation into the case that is not involved."

*Mr. Martine.* " There is not any such intention. So much has been said of this outside influence, I think it fair that this jury should understand that the defendant is not on trial for any of these accusations, and that we do not urge them against them here."

THE COURT. " I supposed that to have been your purpose. Still I think it better that you should avoid such suggestions if the counsel so desires."

*Mr. Martine.* (To the jury.) "This defendant is not charged with any of these matters that have been suggested. There is no intimation, nor shall there be, on the part of the people, that from anything you know outside of this case, this defendant shall be convicted, and we shall not ask or press at your hands that he be so convicted. I shall have done my duty in this case when I have presented to you this evidence, and when that is done, my responsibility ceases. You, gentlemen, after sifting such evidence, will have done your duty when you have rendered your verdict. You are in some sense the servants of the people. I shall endeavor to discharge the duties that the people have confided to me, and I have no doubt, gentlemen, that you also will discharge your duty by rendering a fair verdict between the people and this prisoner. When we shall have done that, we shall have done all that men can do."

*Mr. Tracy.* "If the court please, the district attorney in his opening having said to the jury and charged them to remember that this prisoner was not on trial because it had been alleged of him that he robbed General Grant and sent him broken-hearted to his grave, and also having said to the jury that he is not upon trial because, through fraud and deceit, he caused to be sent to prison for the term of ten years, an old man who has for years been his friend—having stated those facts to the jury, I move now that your Honor discharge this jury from this trial, upon the ground that the district attorney has made an improper and illegal communication to them of facts and allegations against this defendant which are not involved in this issue and do not concern it."

THE COURT. "The motion is hardly made seriously."

*Mr. Tracy.* "It is made seriously."

THE COURT. "It is seriously denied, then. At the same time, it is proper I should caution the jury not to consider anything that may be said by the learned counsel as to any allegations that are foreign to the issues in this case, whether those statements be made by running comment of counsel for the defense, or in the opening by the counsel for the prosecution. There were many irrelevant remarks made during the impaneling of the jury which should be forgotten. You will consider nothing but the indictment that is before you, gentlemen of

the jury, and the evidence which may be given in support of that indictment."

*Mr. Tracy.* "I except to your Honor's ruling in refusing to discharge the jury, and on the question of the motion not being made seriously."

THE COURT. "If you say you make it seriously, I withdraw that observation."

The following witnesses were called by the people: James D. Fish, president of the Marine Bank; Benjamin Fish, paying teller of the Marine Bank; James H. Fish, official stenographer of the U. S. Circuit Court; Samuel V. Cornell, book-keeper of the First National Bank; John H. Carr, receiving teller of the Marine Bank; George J. Chambers, and George E. Spencer.

*Mr. Tracy,* after the preliminary examination of the first witness for the prosecution, moved on the record, that the district attorney be compelled to elect as to which crime charged in the indictment he would give evidence on and try the defendant. The court denied the motion, stating that it would wait until the evidence was in before deciding the question. Defendant excepted.

*Mr. Tracy,* when plaintiff rested, also moved that the prosecution be compelled to elect between the first four counts and the fifth, upon the ground that they related to different offenses.

THE COURT. "I ought to wait until the case is closed—until your evidence is in."

*Mr. Tracy.* "I think not. When all our evidence is in, and I come to go to the jury, I might have a further motion as to which of the four counts the prosecution will elect to go to the jury on."

THE COURT. "I think it is undoubtedly the case that the pleader has simply pleaded the same state of facts in five different aspects, although he happens in the fifth count to refer to a different section of the statute from that under which the other four are drawn. You cannot be prejudiced by going on with your defense against the facts generally, and when the defense is in, I will decide as to whether they should elect and as to which counts they should elect. I do not think that independent crimes resulting from independent facts are

pleaded, and consequently you cannot be prejudiced in your defense. Any defense you have against one count you have against all; for, after all, it is the facts they plead. It may be that the prosecution cannot well tell how they should elect until the evidence is all in. I therefore deny the motion for the time being only. My strong opinion is that it must ultimately come to an election." Defendant excepted.

*Mr. Cockran* then opened the case for the defendant.

The following witnesses were called for the defense: William S. Warner, payee of the checks in question; Julien T. Davies, receiver of the firm of Grant & Ward; and William C. Smith, an employee of Grant & Ward.

*Mr. Tracy*, when the evidence was closed, renewed his motion to compel the prosecution to elect as to which offense stated in the indictment they would ask to go to the jury upon.

THE COURT. "I will require the prosecution to elect as to whether they will go to the jury on the first four counts charging larceny or the last count."

*Mr. Martine.* "We elect to go on the second and fourth counts."

*Mr. Tracy.* "I ask your Honor to direct an acquittal of the defendant on the second and fourth counts of this indictment, on the ground of a variance between the allegations in the indictment and the proof. The indictment alleges that Ferdinand Ward presented his $71,800 check for certification, and thereupon made the representation stated in the indictment, and that he obtained the certification mentioned in the indictment. The proof shows that Ferdinand Ward did not present the check at all for certification; that he passed it away in the usual course of business without certification, and that the owner of the check presented it to the bank for certification, and upon that obtained the certification.* No such facts are alleged in this indictment, and they must be. The statute permits the prosecution to charge that the defendant obtained the property mentioned, either for his own use, or for

---

* The uncontradicted testimony of W. S. Warner, the first witness for the defense, was to this effect.

the use of another; but he must obtain it, and the fact that some other person obtained it, even though he was appealed to on the subject of whether the check should be certified or not, and made representations concerning it, does not sustain an indictment charging that he obtained it. I suppose this is well settled. They could have charged, if they had seen fit to, that he had obtained it for the use of another. That is not here. But if the prosecution intend to allege and prove, if that is their case, that the party obtained it for his own use, they must allege that. If they intend to prove that he procured it for the use of another, they must allege that, and name that other person, else the indictment gives the accused no notice of the facts that are relied upon to sustain that charge. But he must obtain it. Now, in the charging part of this statute, section 528, your Honor will observe that it makes use of two words: first, he who 'takes from the possession of the true owner.' The next is, 'or obtains from such possession of the true owner.' No man can be convicted of larceny under this statute unless he himself either takes from the possession of the true owner, or obtains from the possession of the true owner, and he must obtain it; that is to say, the possession must come to him. He must either take into his possession or he must obtain from the possession. The only importance of the change of those two words is this: the word 'take' applies to where he lays hands upon the property and takes it; not from the immediate possession of the true owner—then he takes it; but where he 'obtains' from the possession of the true owner, he must himself obtain it, and not obtain for another or another obtain. Now who obtained this certification? Did Warner, or did Ward? That is the simple question here. Under the proof in this case, was it Warner or Ward that obtained the certification of the check from the Marine Bank within the meaning of this statute. I apprehend that there can be no doubt as to the legal import of that word, and I apprehend that under the facts in this case there can be no doubt who in law obtained that property. Now the statute does not make it an indictable offense for one to aid and assist another in procuring this, but even if it did, there is no such indictment.

"Your Honor will perceive further as to what must be obtained in order to make this an offense. It must be money, personal property, thing in action, evidence of debt, or contract or article of value of any kind. The only allegation that could be sustained here in this case is that this certification became an evidence of debt against the bank, and that would be so, upon the proof, if they had alleged this certification as they have proved; they would have charged the bank with a liability to Warner; but unfortunately they have not so charged him, and could not under the law, because this certification in the hands of Ward was no cause of action against the Marine Bank. It was no evidence of debt against the Marine Bank. In his hands, this certification amounted to nothing if he had obtained it; and further, if he had obtained it, in order to show that this was capable of working a fraud upon the bank, they would have to allege either that it was a negotiable instrument and had been made negotiable at the time of certification, or they would have to allege that he passed it away to a third party, who presented it for certification and they certified it and thus charged themselves to the drawee of the check. If Ward had presented it illegally to the bank and got it certified, that certification, I repeat, gave it no additional sanctity, no additional value; the bank could have stopped the payment of the checks against Ward at any time. It is only in the hands of a good-faith holder that this certification becomes of value, and it is not alleged that it is in the hands of a good-faith owner.

"I deem it my duty to call your Honor's attention to another point—that is, the two counts in this indictment are fatally defective for another reason, as it seems to me. There is no allegation in either one of these counts that the bank relied upon these representations, and was deceived by them. If there is anything well settled on the subject of obtaining money or property by false pretenses, it is that the prosecutor must allege that the person from whom the property was obtained believed the representations—was deceived by them and acted upon them and parted with his property for that reason. There is no such allegation here. There must be that allegation, and that direct proof. There being no such allegation, I care not what the proof is, that proof cannot go to the jury,

and if this indictment is fatally defective on the point I call your attention . to, then it would become the duty of your Honor to instruct this jury that under this indictment they cannot convict this defendant. Under section 529, which applies to a fraudulent taking, your Honor will perceive that there is the same difficulty.

"I call your Honor's attention to this distinction : Under section 529, it must be 'money or property' that is obtained. It is not enough that it is a right of action. Section 528, procuring by representation, makes it enough if he obtains money, or property or a right of action, or evidence of debt, or anything of value. Section 529 limits the thing to be taken to money or property. Had the Marine Bank any property in this check of $71,800 ?"

THE COURT. "May I suggest to you that section 718 of the Penal Code, subd. 9, defines the term 'property' to include things in action. If property includes things in action, and they aver the taking of a thing in action, then they aver the taking of property, do they not, under section 529 ; and is not the argument gone on that head ? "

*Mr. Tracy.* "Then he must obtain the property or the thing in action from the bank, and the question I repeat is, whose was this check ? When the certification was obtained by Warner, who owned the right of action? Was Ward profited at all by that certification ? He gave the check to Warner, and Warner had a right to draw that money over the counter."

THE COURT. "You go so far as to say that if Ward and Warner had gone together to the paying teller, and upon Warner's then presenting the check for certification, Ward had said to the teller : 'I direct you to certify it,' Ward had not obtained the certification ?"

*Mr. Tracy.* "It is not necessary to go so far as that in this case."

THE COURT. "That is the logic of the argument."

*Mr. Tracy.* "I think not. There is this distinction. If Mr. Warner was the servant or agent of Ward in obtaining the certification, whatever Ward did through his agent or servant, he would do it the same as himself."

THE COURT. "According to the evidence,—and if there is

any evidence tending to show that Ward obtained the certification, there is enough to go to the jury,—Ward, through the telephone, directed this act to be done."

*Mr. Tracy.* "I differ with your Honor, but suppose he did."

THE COURT. " Suppose he stood by, and said to the teller, ' here is Warner with this check of mine, certify it,' and upon that direction it was certified—has not he obtained that certification ?"

*Mr. Tracy.* " No, I hold not, under the law ; he must obtain it for himself. He did not own the check—he had parted with it."

THE COURT. "The moment they certified it, that reduced Ward's balance $71,800 ; it reduced his property in their hands that amount by his act. Thus there was taken from his assets, by the force of his appointment and direction, $71,800."

*Mr. Tracy* cited Willis *v.* People, 19 *Hun,* 84 : " Where an indictment alleges that the prisoner did, by certain false representations, induce a person to deliver to him certain notes and money, a refusal to charge that a conviction could not be had, if it was found that the prisoner did not obtain or receive the note or money, or either, is error."

THE COURT. " That is correct law. But the point is that Ward did obtain the certification."

*Mr. Tracy.* " Where is there any evidence to go to the jury to show that he obtained that certification ?"

THE COURT. " I take it, in legal effect, the transaction is precisely the same as if (Ward and Warner being together when the check was presented) the teller had passed the $71,800 in bills over the counter, and Ward had handed them to Warner in extinguishment of a debt that he owed him. If Ward drew the check on the bank and directed it to be paid out of his funds, and incidentally to be certified, then the payment, in legal effect, was to him—the certification, in legal effect, for him. A man cannot avoid the penal law by making his checks payable to the people with whom he deals or to whom he owes money. If he directs the bank to pay to the order of such people, he directs it to pay to himself by delivering the money to such appointees. If the bank so delivers the money, it is a payment

to the drawer of the check, and such drawer has obtained the money, as between the bank and himself, by its delivery to his appointee. So, if the bank certifies, it certifies for the drawer and at his request—especially if actually so directed. Thus the drawer obtains the chose in action called a certification by its delivery to his appointee.

"It is the same, for the purposes of the criminal law, whether the moneys are physically handed to the drawer's servant or to his legal appointee—whether the certification is made and handed to the drawer's servant or to his legal appointee. The latter may acquire independent rights by the receipt of the certification, but, if the Code is to be interpreted broadly according to its spirit, and not narrowly in the interest of crime, the mere physical delivery of the certification to him is the obtaining of the possession thereof by the drawer who directed the act of certification and such physical delivery to his appointee. The drawer, in effect, says to the bank—in the one case 'pay to me by handing to the person named by me;' in the other case, 'certify for me and deliver such certification to me by handing the same to the person named by me.' The fact that the drawer never personally obtains the physical possession of either funds or certificate is as immaterial in view of the mischiefs aimed at by the Penal Code as though the funds were handed to the drawer's messenger, and the latter immediately fled with them, converting them to his own use and never seeing his principal again. In the latter case, it is conceded that the drawer would be criminally liable, although he never physically obtained the funds. Physical possession, therefore, is not essential. Nor is even the legal right to the funds, as between drawer and the payee, essential for the purposes of the criminal law. If it be, and defendant's contention on that head be correct, then Ward could not be punished at all, even if he had personally obtained the funds or the certification (after the delivery of the check to Warner in payment of an existing indebtedness). If, for instance, after such delivery, Warner had asked Ward to take the check, or Ward had offered to take the check, to the bank and obtain either the funds or the certification for him, Warner, and Ward had, thereupon, actually obtained the physical

possession of the funds or of the certification from the bank by means of false pretenses, the argument, that as he did not obtain such possession for himself, but for Warner, he had committed no criminal offense, would have been equally available. The clear answer to it all is, that within the spirit and intent of the Penal Code it makes no difference whether the mere messenger at the bank was Ward's or Warner's—whether the appointee in the check was Ward or Warner, or Ward's servant, or "bearer." The drawer obtains the possession of the funds or of the certification, when the funds are paid by his direction or the certification made and delivered by his direction to his legal appointee—and that without regard to the property right of such appointee in either funds or certification.

*Mr. Tracy.* " There is no allegation in the indictment that he directed the payment of the certification."

The Court. "My point is that the allegation that Ward obtained the certification is proved by evidence that he drew the check to the order of Warner, and specifically directed the certification by the bank of that check ; and I shall charge the jury that if they so find, he has obtained the certification, and he is guilty, provided they find an intent to defraud."

*Mr. Tracy.* " What does your Honor say as to the omission in the indictment to charge that the bank was deceived by the representation ?"

The Court. " I do not think that is necessary at all. That is a matter of proof."

*Mr. Tracy* then cited Therasson *v* People, 20 *Hun*, 238.

The Court. " It was a draft on the bank, in legal effect to pay to Warner for the use of Ward, and the payment to Warner was to the use of Ward."

*Mr. Tracy.* "However applicable your Honor's view might be to the first count of this indictment, it has no application I submit, to the second and fourth counts, which are for the obtaining possession of a written instrument. It may be,—and I anticipated that difficulty,—that under the first count of the indictment, it might possibly be argued that the giving of the check to Warner and his presentation of it, was the obtaining of the money of the bank within the meaning of that provision, by virtue of it. ' Money,' that is not the second and

fourth counts; they are for the obtaining possession of a written instrument."

THE COURT. "The written instrument is simply an agreement on the part of the bank to pay the check. It accepts the check, acknowledges that it has funds of the drawer, and agrees to pay it. I think that certification is just as much to the use of the drawer, as the payment by the bank of the current funds immediately on the presentation of the check, would have been to the use of the drawer."

*Mr. Tracy.* "I will put my motion in shape and go on. I request your Honor to direct the jury to acquit the defendant Ward upon the second count of the indictment, on the ground of a variance between the allegations in the indictment and the proof—it being alleged in the indictment that Ward presented the check for certification and obtained the certification from the bank, whereas the proof shows that he had delivered the check in the usual course of business to Warner, his debtor, in payment of a debt, and that Warner himself presented the check to the bank and obtained the certification."

Motion denied. Exception.

*Mr. Tracy.* "I make the same request in regard to the fourth count of the indictment."

THE COURT. "Upon consideration, I shall advise the jury to acquit or convict on the second count only, and I will withdraw the fourth count from their consideration."

*Mr. Tracy.* "I now ask your Honor to advise the jury that they cannot safely convict this defendant under the second count of the indictment, because of the insufficiency of the proof."

Motion denied. Exception.

*Mr. Tracy* then summed up the case on behalf of the defendant, and *Mr. Fellows* on behalf of the people, whereupon the court charged the jury as follows:

BARRETT, J.—"Gentlemen of the jury: The question for you to determine under this present indictment arises solely under the second count. You will find the defendant guilty or not guilty of the offense charged in that count. You need not consider any of the other counts in the indictment, and I withdraw

all others from your consideration, so that it will be only neces-
sary for me to explain to you just what is charged in the sec-
ond count, and the law applicable to it.    The second count in
this indictment in plain language charges this defendant with
fraudulently obtaining the certification of a check upon the
Marine National Bank for $71,800, dated May 5, 1884, of
obtaining that certification with intent to defraud the bank,
and of so obtaining it by means of what the law calls false pre-
tense ;  that is, by the deposit in the Marine National Bank of
a check of $75,000 on the First National Bank, which latter
check was bad, but which he represented to be good, and fur-
ther represented that the funds were actually in the First
National Bank to meet it.    That in substance is the charge.

" The old law in reference to false pretenses is embodied in
the present statute against larceny, and if the defendant has
been guilty of obtaining the certification in question by false
pretenses, as I shall lay down the rule upon that head to you,
then he is guilty of the larceny charged in the second count of
the indictment.    The law defines this kind of larceny as fol-
lows :  ' A person who, with the intent to deprive or defraud
the true owner of his property, or of the use and benefit thereof,
or to appropriate the same to the use of the taker, or of any
other person, obtains from the possession of such true owner,
or of any other person, by color or aid of fraudulent or false
representation or pretense, or of any false token or writing, any
money, personal property, thing in action, evidence of debt, or
contract, or articles of value of any kind, steals such property
and is guilty of larceny.'

" I charge you that the certification of a check is a thing in
action within the meaning of this statute.    It is an agreement
on the part of the bank to pay the check.    It acknowledges in
substance that the money is there, and promises that the bank
will pay.    If, therefore, the obligation assumed by such certifi-
cation was obtained from the bank under circumstances amount-
ing to a false pretense, then a crime is committed.

" There are two or three rules about false pretenses that
you  must  understand  clearly.    In  the  first  place,  the
false  pretense  cannot  be  predicated  of  a  mere  matter  of
opinion.    It must be of an existing fact ; and, consequently, the

charge here is that defendant falsely pretended that there was money in the First National Bank to pay the $75,000 check. That is a charge with regard to an existing fact—either the money was there or it was not. So far there is no difficulty.

"Again, the false pretense must not only be predicated of an existing fact, but the false statement or representation must be made with intent to defraud, and the person to whom such false statement or representation is addressed must rely upon it. If it were a naked lie, to which the person addressed paid no attention, that is not enough for the criminal law. The person addressed must be cheated and defrauded by means of the false pretense ; in other words, if the bank here certified this check without regard either to the $75,000 deposit or to the pretense charged,—namely, that that $75,000 check was good and that the money was then in the First National Bank to meet it,—then there is no crime. There must be a misrepresentation made with intent to defraud and relied upon by the party to whom such misrepresentation is addressed. Nay, more, the misrepresentation must be of such a character as would deceive a man of ordinary prudence and caution. A wild, or stupid, or improbable representation, a representation, the falsity of which would be easily detected, will not do. It must be such as would deceive a person of ordinary prudence and caution.

"Now, the question here is, on this second count of the indictment : Did this defendant within these rules commit the crime charged ? He deposited the uncertified $75,000 check on the First National Bank ; that is not disputed. He also drew the $71,800 check on the Marine National Bank and delivered it to Warner ; that is not disputed. This latter check was certified by the paying teller of the Marine National Bank, and the effect of that certification was to obligate the bank to pay it. It also appears that the $75,000 check upon the First National Bank was not good and that the money was not there to pay it. Was the defendant then guilty of a fraudulent misrepresentation upon which Benjamin Fish, the paying teller of the Marine National Bank, certified that $71,800 check, having due authority to so certify ? And was such certification so made in reliance upon such fraudulent misrepresentation ? You will see, gentlemen, the question after all is in a very nar-

row compass; and necessarily so.   Some persons may think it strange that all of a man's doings cannot be investigated at one time in a court of justice, and he be either acquitted or convicted of all the misdeeds laid at his door.   Not infrequently we hear such arguments made and the prosecution criticised for singling out some isolated, perhaps some seemingly insig-nificant act, as the subject of indictment.   But the reason, gen-tlemen, why this course is sometimes adopted, is obvious.   The law does not permit any such *omnium gatherum* as an indict-ment founded upon all the actions of a man's life, or even upon those of a particular epoch.   The criminal law demands that some specific offense be charged and proved.   And it would be impracticable to mete out justice to guilty people in any other manner.   It would also be contrary to the spirit and policy of our law.   We do not indict men for being bad men or loose in their dealings.   We only indict them when they offend against the criminal law.

" It is sad, but if a man keeps his skirts clear of the crim-inal law, he may do many reprehensible things with legal impunity.   So that the prosecution here is not amenable to any just criticism because the indictment charges but a single offense.

" There, at all events, is the charge, and it is our duty to try it, and to try it, gentlemen, fairly and dispassionately, giving this defendant (as he is entitled by the law), the benefit of every reasonable doubt as to his guilt on this specific charge. He is not to be condemned because you may think him to be a loose man, or even a bad man; he is only to be condemned because you believe that the specific accusation here charged has been proved.   That is the only fair way to commence and to conclude a criminal case.   At the same time, gentlemen, if this defendant be guilty of this specific charge, it would be a very serious matter if he should escape—almost as serious as though he should be punished if innocent.

" Now, let us see for a moment just how this matter stands. On Saturday, May 3, this defendant deposited a check for $80,000 in the Marine National Bank; that check was uncer-tified; it was a check upon the First National Bank, where he kept an account; against that check he drew a check upon the

Marine National Bank for $81,000 on the same day, payable to the order of W. S. Warner. There are the two transactions—the deposit and the drawing of a check. The check for $81,000 was certified on the faith of the deposit of the uncertified $80,000 check. You have heard how that $81,000 check came to be certified and all the facts about it. In the ordinary course of business, if those two checks went through, the $81,000 check would be charged to the Marine National Bank on Monday morning in the clearing-house, and the $80,000 check would on the same morning be sent into the clearing-house by the Marine National Bank to obtain its approptiate credit.

"We now come to Monday morning (May 5) at nine o'clock or thereabouts. At or about that time, according to the testimony of Mr. James D. Fish, this defendant came to him and asked him not to send that $80,000 check through the clearing-house that morning. It is true, as suggested by the learned counsel for the people, that nothing was then said as to a deficiency of money in the First National Bank to meet it. What Ward said, according to Fish's testimony, was substantially this: 'The $81,000 check will not go through; in other words, the bank will not be debited this morning with that certified check; therefore, do not ask a credit for the $80,000 check.' Fish consented—so he says. A very simple business transaction, you will perceive. One check is not to be used, so do not use the other. That is all very plain and very simple, but it has a very significant bearing upon what happened subsequently. You have heard the evidence as to the letters which passed between Fish and Ward that day, the pressure the bank was under for money, and the efforts that were being made by this defendant to get it. That is more or less important in another aspect of the case.

"The bank having held back the $80,000 check, surprise was naturally felt when the $81,000 check came in from the clearance of that morning. The bank had been induced to keep back the $80,000 check on the assurance that the $81,000 check was not coming through—and yet there it was. The bank had been charged with it, and now it was too late to send the $80,000 check into the clearing-house that day. Of course, the bank officers could have taken that $80,000 check (just as

soon as they received the $81,000 check from the clearing-house) up to the First National Bank, and asked for the money. But I am speaking of the ordinary course of business as transacted through the clearing-house. What, then, did they do? In place of sending to the First National Bank for the $80,000, Fish says he called up Ward through the telephone, and asked him what it all meant. He says he recalled to Ward the assurance given early that morning that that check was not used, and told him that it had been used, and that, in fact, it had come into the bank. It is for you to say whether that statement is probable or improbable, whether it is the way a man would have been likely to speak under such circumstances. Fish says that Ward, in reply, promised to make it all right. We come now to the specific transaction which is the subject of this indictment.

"Later in the day, a deposit was made of a $75,000 check which bears the same relation to the $71,800 check that the· $80,000 check bore to the $81,000 check. A deposit was made of an uncertified check for $75,000, drawn by Ward on the First National Bank, and a check for $71,800 drawn by Ward on the Marine National Bank was given by him to Warner. This latter check for $71,800 is then presented to the Marine National Bank for certification. The paying teller, knowing what had transpired that morning with regard to the $81,000 check, and being aware of the situation of affairs, says that he felt bound, before certifying the $71,800 check, to consult the president. The paying teller was Benjamin Fish. He tells us that before consulting the president, he spoke first to the receiving teller. What they said to each other we could not allow in evidence. Whether Benjamin Fish learned of the deposit of the $75,000 check is neither here nor there; what we know is, that after speaking to the receiving teller, he went to the president.

"Now, the crucial fact of this case is, what then happened. James D. Fish and Benjamin Fish both say that when James D. Fish's attention was called to the fact that there was another check (of $71,800) presented for certification, he at once called up Ward through the telephone to know what that meant. James D. Fish says that Ward declared it was all right, that

the checks on the First National Bank were good, and that the money was there to meet them.

"From that you are asked to infer that Ward intended to convey the idea that the money was then actually in the First National Bank to meet the $71,800 check, which was then presented for certification. The Fishes say that on the faith of that positive statement,—that the money was actually there to meet the checks,—and relying upon such positive statement, the $71,800 check was certified.

"Now, gentlemen, the whole case is right there. Do you believe that? If you do, then that was a misrepresentation of an existing fact. Was it probable or improbable, that after what had transpired in the morning, the bank president and all concerned, should have been cautious about certifying that second or additional check, that check for $71,800? Was it probable or improbable, that they should have asked for information about it? Was it likely that they would have certified it if they had not some distinct assurances about it? That is a question for you.

"The defense claim, that owing to the general transactions and the course of dealing between Grant & Ward and the bank, this particular transaction would not have been likely to cause the apprehension or doubt which, according to the Fishes, induced them to interrogate Ward, and which was answered by the alleged misrepresentation. The people, on the other hand, claim that these general transactions, and the condition in which they left the bank were, under existing circumstances, and at that critical moment, an additional spur to caution upon the president; to be cautious then if he had never been so before. The defense claims that everything tends to show such a general looseness of dealing as to justify the inference that, without regard to this representation, the bank would have certified the check without question, because of Fish's desire to support Ward and interest in supporting him. On the other hand, the prosecution claims, in substance, that at last Fish called a halt. It is for you to say where the probabilities lie. You have to take the probabilities and the improbabilities of the case, with a view of determining not only what reliance was placed upon the alleged pretense, but whether in fact, it

was made.   The defense claim that you are to disbelieve
entirely the sworn testimony of Benjamin Fish and James D.
Fish.   They have offered no evidence in contradiction of this
testimony.   If they had no evidence with which to contradict
it except the testimony of the defendant, then I charge you
that the defendant is not to be prejudiced by the fact that he
did not deny it; because, although the law allows him to testify
on his own behalf, it is entirely true, as suggested by his
learned counsel, that the law expressly declares that he shall
not be prejudiced by the fact that he does not avail himself of
that privilege.   As to any other witness, the law is different.
We do not know whether any other witness was present
during this telephonic conversation, nor that it was in the power
of the defendant to produce any upon that head.   All we do
know is that James D. Fish and Benjamin Fish testified as they
did with regard to it; that there is no evidence in contradiction
of their testimony; and that you are asked to disbelieve the
evidence of those two men, on the ground, first, that James D.
Fish is a convict; and second, that the testimony of both Ben-
jamin Fish and of James D. Fish is improbable and unworthy
of credence.*   You are the exclusive judges of the facts; you

---

\* The substance of the testimony referred to, is contained in the follow-
ing extracts from the testimony given on the trial.

James D. Fish, the first witness for the people, stated: "I am sixty-
six years old.   I am a resident of Auburn State Prison, to which I have been
sentenced for a term of ten years at hard labor.   My occupation is that
of a convict.   Prior to this for more than twenty-three years I was presi-
dent of the Marine Bank in New York city.   I know the prisoner, Ferdi-
nand Ward.

"Q. (Handing witness defendant's $71,800 check on Marine Bank,
referred to in the indictment.)   Look at that paper and see whether you
have ever seen it before?"

(At this point the first motion to compel the prosecution to elect which
count of the indictment they would go upon, was made and denied, and
exception taken.)

"A. I first saw the paper May 5, 1884, when it was brought to my
desk in the Marine Bank by the paying teller.   I had a conversation with
the teller at the time he handed me the check.   The first thing after this
conversation I went to the telephone and rung up Mr. Ward.   It was a
direct telephone between Grant & Ward's office and the bank.   I had
conversed with defendant Ward hundreds of times over it before, and

have the power, and indeed you have the right to disregard the testimony of any man if you think that he has not testified truly. You see the witnesses on the stand, and you judge of

---

could recognize his voice very distinctly. I recognized it on this occasion.

" Q. What did you say to Mr. Ward over the telephone, and what did he state to you ?" Defendant's counsel objected to any conversation over a telephone as inadmissible. Objection overruled, and exception taken.

" A. I said, ' Ward, your check for $71,800 is presented for certification against an uncertified check of yours on the First National Bank for $75,000.' 'It is all right,' he said. I said, ' We have the other check of $80,000 uncertified, against which we certified a check of $81,000, making in the two checks uncertified of yours on the First National Bank $155,000.' He says, ' That is all right; the checks are good; send them through. Go ahead and send them through; they are all right; the money is there to pay the checks.' In consequence of that, I directed the teller to certify the check. I believe that to be the certification (examining it). I have seen Ward write and am familiar with his handwriting. That check is in his handwriting. (Check put in evidence marked Ex. A.) It was in the afternoon this check was presented, and I went to the telephone. I saw Mr. Ward the morning of the 5th, between nine and ten o'clock.

" Q. State what he said to you and what was said to him concerning a check for $80,000, and one that had been certified by you for $81,000 ? Objected to on the ground that those checks are not involved in the indictment. Objection overruled, and exception taken.

" A. Mr. Ward came on Monday morning before the checks were sent out in the exchanges, before the exchanges were sent out. He said he wished to withdraw the check of $80,000, which was drawn on the First National Bank, for the reason that the $81,000 check which was certified by us on Saturday had been withdrawn, and was not used, and therefore he did not wish the check of $80,000 to be used. He did not wish it sent through, for the reason that the check certified by us was not used." (The $75,000 check, $80,000 check and the $81,000 check, were all identified by the witness as being in defendant's handwriting, and were marked.) " Mr. John Carr, the receiving teller of the bank, was present at this conversation. I told him to withhold the certified check. I had a conversation shortly afterwards with the paying teller, in consequence of which I went to the telephone and called Ward and said, ' Ward, that check for $81,000, certified, which you said was not sent, has come through the exchanges and we have paid it.' He said it was very strange; he did not understand it ; he was very busy, but it was all right, and he would attend to it. This was in the morning. The other conversation occurred in the afternoon. One was about the transaction of the 3d, and the other about the transaction of that day (5th.) I most implicitly believed Ward when he told me the

them.    Ordinarily, gentlemen, testimony which has neither
been impeached nor contradicted is not to be lightly set aside,
—certainly not from any caprice on the part of the jury ; but if
in your innermost consciences, after weighing the testi-
mony fairly and without prejudice, you feel that the truth has
not been spoken to you, you can disbelieve a hundred men,
even if they are not contradicted.    So that the question is,
whether what took place at the time this $71,800 check was
presented for certification, is truly testified to by these wit-
nesses James D. and Benjamin Fish—whether what they say
is or is not probable, considering what had previously trans-
pired and what they say then transpired.    You are not to be
deceived nor confused by the mass of evidence which has been
given about the general transactions between Grant & Ward
and this Marine Bank.    The object of that evidence was not
to show that this defendant was guilty of independent offenses,
not to show any other transaction of a guilty character.    The
object was this : to show that the dealings between the bank

checks on the First National Bank were good, and that the money was there
to pay them.    He positively stated that the money was there to pay the
checks, and send them through, and I relied upon that when I caused the
check of $71,800 to be certified.    The Marine Bank was in New York
city, several hundred feet distant from Ward's office—the distance from
Broadway to Pearl street on Wall street.    The Marine Bank failed May 6,
the day after the occurrence I have related."

Benjamin Fish, the paying teller of the Marine Bank, testified that
when the $71,800 check was presented for certification about two o'clock
in the afternoon of May 5, 1884, he took it to the president, James D.
Fish, and that the president, after some conversation with him, went to
the telephone, and rang the bell and called Ward (the defendant) ; that he
(the witness) stood at the president's elbow, about six inches from the
receiver of the telephone, which the president had at his ear, the instru-
ment being in the president's room, open and without enclosure; that he
heard the conversation which ensued, and what was said by both parties
to it, and recognized defendant's voice throughout; and he testified to the
conversation in substance as stated in the evidence of James D. Fish,
given above.    The witness also testified that he heard, under the same cir-
cumstances, what was said by James D. Fish, in the telephonic conversa-
tion, on the morning of the 5th between eleven and twelve o'clock, in
regard to the $81,000 check, and part of what was said in reply by the
defendant, whose voice he recognized, the witness' testimony being cor-
roborative of the testimony of James D. Fish in that regard.

and Grant & Ward, prior to this particular transaction, were so vast, so peculiar and so combined with personal interests, as to throw doubt upon the testimony of the Fishes, when they say that a direct representation was called for and made, and also to show the probability of the bank's certifying Ward's check for $71,800 without question, notwithstanding what had transpired with regard to the $81,000 check. That was probably the theory upon which it was offered. The defense also gave some evidence that, after the failure, certain assets were found—with a view, I suppose, of asking you to believe that with those assets the defendant had it in his power to make the check good, and that it was a misfortune or disaster that he did not do it.

" All of this, gentlemen, was admitted merely on the question of motive; for after all, while on that question you may consider those facts, yet if you believe the evidence of the two Fishes, that the check was presented in the manner in which they say it was, for certification, and that this defendant, in order to induce that certification, declared that the money was in the First National Bank to meet the $75,000 check; that that false statement did really deceive the bank into certifying, and they would not have done so but for that misrepresentation, then the defendant is guilty. If you believe that beyond any reasonable doubt, it will be your duty to convict him.

" I have allowed some evidence of an interview which took place between James D. Fish and the defendant a few days after this transaction. The object of that evidence was to show that the defendant acted as though he felt that he was guilty.

" Now, gentlemen, it is only fair to this defendant to say (and I wish to be entirely fair to all), that even if you believe that Fish told the truth about that interview, that it happened just as he says it did, still if the defendant's seeming regret and penitence meant regret and penitence for the general disaster,— for the ruin of the bank, if you will,—for the misfortune which has befallen Fish, if you will,—and had no special reference to the particular transaction as to which we are now inquiring, why then it does not tend to show guilty knowledge with respect to that particular transaction ; in other words, if it was

repentance generally, then we answer he is not being tried gen-
erally but specifically.   At the same time, gentlemen, I could
not exclude the evidence, as it was impossible to say in advance
whether it referred to general or particular acts or to both.   I
can only say to you, now that it is in, that it should not affect
the defendant unless you believe that his seeming regret had
reference to guilty knowledge with respect to this particular
charge.*   With that limitation and caution regarding that
piece of testimony, I leave that branch of the case with you.

And so in reference to the matter of alleged flight, there was
no flight in the sense of fleeing the jurisdiction.   It is true the
defendant went to Stamford—but he had a house there.   It is
also true that he came back in the manner which has been testi-
fied to, and we cannot shut our eyes to the fact that he took a

---

* The testimony in question was given by James D. Fish, in substance
as follows: "It was not exclusively, it was not with Grant and Ward par-
ticularly with the bank, but rather a general conversation, and the effect
that it had upon the bank.   He (the defendant) came to me at my room
up-stairs at the bank, three or four days after the failure.   He said that
he wanted to make an explanation about matters; that he could not help
it, what he had done ; he was driven to it, and did not know why he did
it.   I told him that he had ruined me; he had ruined my family, my good
reputation in a community in which I had lived for more than forty years.
I had more than a competency, and by his deception he had ruined me
entirely; he had broken the bank and ruined me in every way; that no
disgrace had ever been brought upon me by any business transaction, and
now I was made to appear like a rogue by his misrepresentations.   I said
if he was not such a contemptible black-hearted villain, and the most
ungrateful serpent and reptile I ever saw, I would kill him on the spot.
With that he got down on the floor and begged I would not kill him.
(Objected to.   Overruled.   Exception.)   He admitted that I had been
his best friend.   He said that what I had charged him with was true—his
ingratitude and treachery and ruin of me, he admitted to be true.   I felt
so indignant and injured that I would then have killed him on the spot, if
he were not such a contemptible sneaking whelp, and I took a chair and
flourished it over my head.   He got down on the floor and crouched like a
whipped puppy. (Last part of answer objected to.   Sustained.)   He cried
and whined and said, 'Don't hurt me.   Don't do it. I advised him to go
and commit suicide, hang himself, drown himself, do anything. (Last part
of answer stricken out.)   I used the strongest language I found in my
repertoire, the strongest adjectives.   He was down all the time in a more
crouching manner than he now is."

circuitous route to reach his home in Brooklyn, and that he did so for the reasons stated by him in another proceeding.*

" I am asked to charge that that is not necessarily a pre-sumption of guilt. That is true; but it is fair for you to con-sider it with all the other evidence in the case upon the ques-tion of guilty intent. At the same time, that too is subject to the same limitation and criticism, which I have made with respect to the interview between James D. Fish and the defendant after the failure. If the course which the defend-ant took in reference to his manner of coming home, &c., was because of his sense of danger growing out of the general dis-aster, and was not superinduced by any such sense with regard to this particular transaction now under investigation, then of course, it does not affect the question of guilty intent in refer-ence to this specific charge.

" To recapitulate : It will be for you to say whether the false representations have been made out; whether you believe the evidence of these two witnesses, James D. and Benjamin Fish, who swore to them ; whether they were really made and were false ; whether, if made and false, the bank relied upon them ; whether they were made with intent to deceive and defraud the bank ; and whether they were of such a character as to deceive any person of ordinary prudence—if you find all these facts beyond any reasonable doubt, it will be your duty to convict this defendant, otherwise to acquit him.

" It is very important, gentlemen, I will say to you in con-clusion, that you should approach this case without fear or favor, for this defendant is not alone on trial. Practically he is so. But the administration of justice is also on trial. The people believe, gentlemen, that our institutions largely rest upon and are supported by the jury box. As was well and beautifully said by the able and learned counsel who opened this case for the defense, the jury-box may be likened in a cer-

---

* The defendant stated in said proceeding (reference of Holt, receiver, *v.* Warner), that he did not know but there might be trouble with the Marine Bank and it was best for him to take a circuitous route, viz.; through by-streets from the Grand Central depot in New York city, to his house in Brooklyn, entering his house by the stable-door. This was on May 6, 1884.

tain sense to the sanctuary of old. The people trust it, and it is of vital importance that their faith should be maintained. We believe, gentlemen, that there is sufficient virtue in the people to enable us to select from their midst, in all cases, twelve men who have sufficient intelligence and integrity to see that innocence is protected, and that guilt is punished. We believe, gentlemen, that no clamor, however great, can induce a jury to strike down a really innocent man, and that no influence, however great, whether it be that of friendship or of power, or (most detestable of all) of money, can induce a jury to acquit a really guilty man. We sometimes see obstructions and even occasional miscarriages, in the administration of justice; we not infrequently perceive that the road is long and tedious; but my experience is that the jury system is a good one, in fact, the only safe one, and that it does protect the innocent and in the end punish the guilty."

Defendant's counsel requested the court to charge the jury as follows:—

First. "That although the jury may find the false pretenses to have been made, and the necessary fraudulent intent, yet the jury have no right to consider these questions or the evidence as to them, in determining the question whether the pretenses exerted a material influence on the bank in certifying the check in question."

The court so charged.

Second. "To convict the defendant, the jury must find that the bank relied upon the pretenses charged, or some of them, in certifying the check."

The court so charged.

Third. "That if the jury find that the pretenses were false, and known to be false by Ward at the time they were made, the law, from these facts, does not presume a fraudulent intent."

The court so charged.

Fourth. "That no proof has been presented that the defendant obtained or appropriated to his own use the certification, instrument, writing or evidence of a right in action mentioned in the second count of the indictment, and that

without such proof the jury should acquit the defendant on that count."

The court refused so to charge. Defendant excepted.

Fifth. "That if the jury believe that in authorizing the certification of the check in question for $71,800, the Marine National Bank, without reference to or dependence upon the alleged false pretenses of the defendant, relied upon the promise of or acted upon the expectation of further deposits to be made in the Marine Bank that day by the defendant, or by Grant & Ward, then as matter of law, there can be no conviction under the indictment, and the defendant should be acquitted."

The court so charged.

Sixth. "That in weighing the evidence of James D. Fish the jury have a right, and it is their duty, to take into consideration the fact of his conviction of a felony, and his sentence to penal imprisonment for ten years, and the further fact that he testifies under a practical immunity from the legal penalties of perjury."

The court so charged.

Seventh. "That the jury is not bound to believe either James D. Fish or his brother, Benjamin Fish, in the alleged telephonic conversations with Ward on May 5, 1884, and the jury has the right to reject that, and any other testimony, if from all the facts and circumstances they conclude that it be untrue."

The court so charged.

Eighth. "That this court has no jurisdiction of a charge against a director of a National bank for drawing and unlawfully and fraudulently obtaining the certification of a check by the officers of such bank; and therefore there can be no lawful conviction on the indictment, and the prisoner should be acquitted."*

The court refused so to charge. Defendant excepted.

Ninth. "That it is a question for the jury whether the alleged fraudulent representation as reported by James D. Fish, was calculated to mislead an honest and ordinarily prudent

---

* It appeared in evidence that the defendant was one of the directors of the Marine Bank.

person, and if it was not, then there was no false or fraudulent representation within the meaning of the Penal Code, and the defendant in that case should be acquitted."

The court so charged.

Tenth. " In weighing the evidence the jury have a right to consider the nearness and ease with which a direct inquiry could have been made of the First National Bank as to whether the $75,000 check was good or bad."

The court so charged.

Eleventh. " If the jury believe that the bank, when it certified the check in question, was not deceived by the alleged false representations by the defendant, then there can be no conviction under this indictment, and the defendant should be acquitted."

The court so charged.

Twelfth. " That there is no evidence of any flight of the defendant, and no presumption of guilt is to be entertained on this indictment from the acts of the defendant on the 6th day of May, 1884."

THE COURT. " There is no evidence of flight in the sense of fleeing the jurisdiction ; but there is the evidence which has been read, of what the defendant did on the 6th day of May, 1884, and it is for the jury to say whether what defendant so did has any bearing upon the guilty intent charged in the indictment. No presumption of guilt is to be entertained from these doings of the 6th. "

Mr. Tracy. " I ask your Honor to charge the jury that if they believe that when Warner's clerk presented the check for certification the accused made the representation testified to by James D. and Benjamin Fish, through the telephone, and that the bank relied upon it and was deceived by it, still, as the check was certified for Warner, that representation cannot constitute a false pretense within the meaning of the statute."

The court refused so to charge. Defendant excepted.

Mr. Tracy. " I desire to except to that part of your Honor's charge wherein you say that if the defendant made the representation as testified to by the Messrs. Fish, and that it was false and fraudulent, and the bank relied upon it and was

deceived by it, then the defendant is guilty and should be convicted."

THE COURT. "What is the objection to that part of the charge?"

*Mr. Tracy.* "That even although he made the representation as alleged, still, as the check was not presented by him, or obtained by him, the representation cannot constitute a false pretense."

THE COURT. "With that suggestion I decline to charge otherwise than I have, and I will allow you the exception to the charge as made."

*Mr. Cuming.* "We desire also to except to that part of the charge wherein the court said, 'I charge you that the certification of a check is a thing in action within the meaning of this statute. It is an agreement on the part of the bank to pay the check. It acknowledges in substance that the money is there, and promises that the bank will pay. If, therefore, the obligation assumed by such certification was obtained from the bank under circumstances amounting to a false pretense, then a crime is committed.'"

*Mr. Tracy.* "I also except to that part of your Honor's charge to the jury in reference to what inference might be drawn from the defendant's circuitous route when he left Stamford."

The jury returning to the court for further instructions, the court said:

THE COURT. "The question which I left to you to determine was whether, under the circumstances which existed at the time the $71,800 check was presented for certification, the bank would have certified that check if some distinct representation had not been made. If, to use the language that you have just addressed to me, you believe that no representation was made as to the funds in the First National Bank, that is one thing. If you believe that the representation was made, and it was because that representation was made, that James D. Fish, the president of the Marine Bank, ordered the check to be certified, why, then, that settles that branch of the case. If you believe that the representations were made, and that there was no reliance upon them,—or to use the language of the juror, the bank certified it without regard to the representations, with no

reliance upon them,—then, of course, the false pretense is not made out. I call your attention to the fact that what had transpired about the earlier check has bearing upon that question in connection with all the other facts of the case, and ask you to consider, in view of the fact that the earlier check had gone through and had been paid by the bank, notwithstanding Ward's promise that it was not to go through, whether it was likely, after that, that a new check for such a large amount as $71,800, would have been certified, merely because the bank wanted to sustain Ward. If, notwithstanding what had transpired about the earlier check, notwithstanding the position the bank found itself in by that, you think either the representations were not made, or, even if made, the bank would have certified, and did certify just to support Ward, that is one thing; but if you believe, in consequence of the condition of the bank in reference to the earlier check, and in reference to the state of the accounts at that time, the president of the bank, when he saw this check for $71,800 called up Ward for the purpose of getting more explicit information in reference to that fact, and then the statement was made that the moneys were in the First National Bank to meet it, and the president believed it, and relied upon it, and would not have certified but for that, then the pretense is made out."

A juror requested to hear the evidence of James D. Fish re-read where he speaks about certifying, and as to the question whether if he certified it would not have precipitated the failure of the bank.

THE COURT. " The substance of it was that the refusal to certify the checks of some people would have precipitated the failure of the bank, and the refusal to certify the checks of other people would not necessarily have done so. For instance, the refusal to certify a check given by Ward to the banker Seligman would probably, Mr. Fish said, have been noised about the street at once and caused a precipitation. Whether that would have occurred in the case of Mr. Warner, was a question upon which he did not pass a positive opinion. He said the refusal to honor some checks of Ward's in the hands of private individuals might not have caused the failure of the bank, and

the refusal to honor such check in the hands of other people (like the Seligmans) would.

"The claim the prosecution make is just this: that the failure to certify Warner's check would not have precipitated the failure of the bank necessarily, and they claim, therefore, that the president of the bank must have relied upon the representation."

*Mr. Tracy.* "Our position is directly the reverse. We claim that the failure to certify any check would have precipitated the failure."

THE COURT. "You do not claim that that was the testimony of Mr. Fish?"

*Mr. Tracy.* "I think Mr. Fish expressed the opinion, or a doubt at least, whether the failure to certify Mr. Warner's check would have precipitated the failure."

THE COURT. "Warner was not a public banker. He was a private customer of Mr. Ward's, and the prosecution claim that the bank was not under any great stress to honor that check, and it was not likely that they would have honored it unless they had the representation. That is their claim."

*Mr. Tracy.* "I feel constrained to renew my exception to your Honor's charge, that if the jury believe the representation was made and the bank relied upon that representation in certifying the check, then the charge of the false pretense is made out."

THE COURT. "I said the charge of larceny is made out."

*Mr. Tracy.* "To that I except."

THE COURT. "I will put it in shape so that you can have the proper exception. If the jury believe that the bank would have refused to certify that particular check at that time, if it had not been for the representation; further, that the representation was false, was made with intent to deceive and defraud, and that the bank relied upon it, then it was larceny."

*Mr. Tracy.* "To that I desire to except."

Upon request of one of the jurors, the court read the following extract from the testimony of James D. Fish: "Q. Did you understand on the 15th day of May that the effect of a failure to certify for Ward or for Grant & Ward would precipitate the failure of their firm? A. A refusal to certify

checks on Grant & Ward might. I do not know whether it would in the case of Ferdinand Ward. Q. Do you think that Ferdinand Ward could have failed at that time without precipitating a crisis, both as to the firm of Grant & Ward and of the Marine Bank? A. If it had been proclaimed generally he had failed. I believe the check which Warner sent there and was not certified—Q. I am speaking of the refusal to certify—a refusal to certify for Ward and Grant & Ward? A. It makes a difference who it is for. Q. It does? A. It does, decidedly. I would be happy to explain. Q. Did you not understand on May 5, that a refusal of the Marine Bank to certify for Grant & Ward or for Ward would precipitate a failure of the firm and of the Marine Bank? A. Do you want an intelligent answer to that? Q. Yes, that is what I am calling for. A. To begin with: If Mr. W. S. Warner had sent Ward's check there to be certified, and we refused to do it, I do not think anything would be said about it; the public would not know anything about it. If Seligman had sent a check of Grant & Ward's there to that bank for $50,000, or $81,000 and the bank refused, I think it would have been rumored all over the street, and Grant & Ward would have gone up, and knowing the relations of Grant & Ward to the Marine Bank, it would also cause suspension of the bank. Q. Then the true situation was, as you understand it, on May 5, that certification by the bank of whatever Grant & Ward sent there was essential to the preservation of the firm and of the bank? A. It would depend, as I told you, from whom those checks came for certification."

The jury again retired, and returned again to court at 12.45 P. M., and rendered a verdict that the defendant was guilty of the offense charged in the second count of the indictment.

On October 31, 1885, the court met pursuant to adjournment.

*Mr. Tracy* moved for an arrest of the judgment in this action, on the grounds: First, that the facts stated in the second count of the indictment do not constitute a crime. Second, that the defendant being a director of a National bank, and the evidence charging him with procuring the unlawful certi-

fication of his own check by that National bank, this court has not jurisdiction of the subject of the indictment. Motion denied. Defendant excepted.

*Mr. Tracy* then moved for a new trial, on the ground that the court misdirected the jury in various matters of law upon the following grounds : First. In charging the jury that there was sufficient evidence adduced against the prisoner upon which to base a conviction. Second. In charging the jury the several propositions to which, upon the trial, exceptions were taken, and noted on behalf of the defendant as appears on the minutes of the trial. Third. In refusing to charge the jury the several matters requested by the defendant, to which refusal exceptions were then and there taken and noted, as appears by said minutes. Fourth. In refusing to advise the jury to acquit the defendant, to which refusal the defendant duly excepted. Fifth. In refusing to direct the jury to acquit the defendant, to which refusal the defendant duly excepted. Sixth. In refusing to direct the jury to acquit the defendant on the ground of a variance between the proof and the indictment, to which refusal the defendant duly excepted. Motion denied. Defendant excepted.

*Mr. Martine* then moved for sentence.

The clerk then asked the defendant what he had to say why judgment of the court should not be pronounced against him according to law, to which the defendant replied : " Nothing, sir."

The court thereupon sentenced the prisoner to confinement in the state prison at hard labor, for the period of ten years.

NOTE.—In Walsh *v.* People, 38 *N. Y.* 458, the Court of Appeals say : " The extent to which counsel may go in opening a case to the jury, cannot, in the nature of things, be regulated by precise rule. The court may doubtless interfere in the interest of justice to restrain undue license on the part of counsel in addressing the jury. It might, perhaps, be its legal duty to interfere, in a criminal case, where the prosecuting officer, under the guise of opening the case to the jury, should seek to prejudice them by the recital of facts proposed to be proved, which would be manifestly incompetent if offered in evidence. But in general the interference of the court must be a matter of discretion, the exercise of which is not the subject of exception." (p. 464–5).

See Cobb *v.* Cobb, 79 *N. C.* 589; 28 *Am. Rep.* 338; Cleveland Paper Co. *v.* Banks, 15 *Neb.* 20; 48 *Am. Rep.* 334, 336, *n.; Proffatt on Jury Trials,* § 209. As to irregularities in the conduct of the trial, see 32 *English Rep. (Moak's),* 277, *n.*